UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA  DIVISION

| | | |
|---|---|---|
| RONALD DWIGHT EADY, | ) | |
| | ) | |
| Plaintiff, | ) | 1:22-CV-00047-DCLC-SKL |
| | ) | |
| v. | ) | |
| | ) | |
| DANNY BRYANT, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment [Doc. 63].

For the reasons discussed below, Defendants' Motion [Doc. 63] is **GRANTED**.

**I.     BACKGROUND**

**A.     December 27, 2021**

Plaintiff Ronald Dwight Eady is an African American who resides in Fayetteville,

Tennessee, with his two Pitbull dogs: Scrappy and Tyson [Doc. 17, pgs. 1, 5; *see* Doc. 63-1, 195:4;

Doc. 63-2, 8:10; Doc. 63-4, 10:8; Doc. 63-5, ¶ 4; Doc. 63-8, 21:9–21:16].  Plaintiff works as a

commercial truck driver in Madison, Alabama [Doc. 17, pgs. 1, 5].  Plaintiff went to work on

December 27, 2021, leaving the two dogs in the care of his former girlfriend, Shavante Jones [Doc.

17, pg. 1; Doc. 63-1, 44:7–44:9, 85:6–85:7].  While Plaintiff was away, the dogs got loose and

began fighting [*See* Doc. 17, pg. 5; Doc. 63-8, 21:2–21:16].  A neighbor called 911 and reported

that two dogs were fighting [Doc. 66, ¶ 1; *see* Exh. 6].  Defendant Fayetteville Police Department

("FPD") Officer Danny Bryant was dispatched to respond [Doc. 63-5, ¶¶ 2–3].

When Officer Bryant arrived, he saw Scrappy lying on the ground bleeding and Tyson "running around [Plaintiff's] yard with blood on its face" [Doc. 66, ¶ 4; Doc. 63-5, ¶ 4]. Officer Bryant was not familiar with either dog [Doc. 66, ¶ 2]. Neighbors advised Officer Bryant to be careful because Tyson was "aggressive" [Doc. 63-5, ¶ 6]. Officer Bryant called animal control for assistance [Doc. 63-5, ¶ 7]. While Officer Bryant waited for animal control, Tyson "started to aggressively run towards several children who were down the street" [Doc. 63-5, ¶ 8]. Officer Bryant attempted use his patrol car to block Tyson's path but was unable to divert the dog away [Doc. 63-5, ¶ 9]. The children jumped onto the roofs of nearby parked cars and fled to a porch for safety [Doc. 63-5, ¶ 9]. The dog then proceeded down an alley [Doc. 63-5, ¶¶ 10].

Animal Control Officers Laura Bryant, Michael Holman, and Kevin Henderson responded to the scene [*See* Doc. 63-2, 8:25–9:16; Doc. 63-3, 7:10–7:12; Doc. 63-4, 9:24–10:9]. As they attempted to secure the dog, it ran behind another house where the Animal Control Officers gave chase [Doc. 63-2, 10:19–10:20; Doc. 63-3, 7:23–8:2]. At one point, Officer Laura Bryant almost succeeded in coaxing Tyson to come towards her, but Tyson soon ran away [Doc. 63-2, 10:19–10:22; Doc. 63-3, 8:7–8:10]. Tyson then ran towards Jones, but suddenly stopped and started going towards the front of the neighborhood [Doc. 63-4, 10:12–10:16].

While the Animal Control Officers struggled to secure Tyson, Officer Bryant observed Tyson "growl" at Jones when she attempted to approach it [Doc. 63-5, ¶ 12]. Officer Bryant called his supervisor, Sergeant Mark Browning, who advised him "to use whatever force necessary to protect [himself] or others, if needed" [Doc. 63-5, ¶ 13]. Officer Bryant and Holman then drove to a church near the front of the neighborhood to prevent Tyson from leaving the immediate area [Doc. 63-2, 10:22–10:24; Doc. 63-5, ¶ 14].

2

Once at the church, Officer Bryant brandished his shotgun and waited near Holman's pick-up truck [Doc. 63-5, ¶ 15]. Officer Bryant and Holman observed Tyson run towards them [Doc. 63-2, 11:4–11:9; Doc. 63-5, ¶ 16]. Just before Tyson reached them, Officer Bryant jumped into the truck bed and attempted to use pepper spray on the dog but was unsuccessful [Doc. 63-2, 11:9–11:10; Doc. 63-5, ¶¶ 16–17]. Laura Bryant then arrived in her truck and exited [Doc. 63-3, 8:10–8:13; Doc. 63-5, ¶¶ 18–19]. As she did, Officer Bryant saw Tyson begin to "aggressively run towards her" [Doc. 63-3, 9:11–9:12; Doc. 63-5, ¶ 19]. Believing Tyson was going to attack Laura Bryant, Officer Bryant shot Tyson twice, killing the dog [*Id.*].

## B. January 11, 2022

On January 11, 2022, Plaintiff encountered his former girlfriend Jones on the front porch of his house [Doc. 63-1, 140:24–140:25]. She jumped in Plaintiff's car and refused to leave [Doc. 63-1, 140:25–141:1, 141:10–141:12]. Plaintiff called 911, which dispatched Defendant FPD Sergeant Doug Allen to the location [Doc. 63-1, 141:1–141:9; Doc. 63-6, ¶ 3]. Sergeant Allen was familiar with Plaintiff, as he had previously arrested him for domestic assault against Jones [Doc. 63-6, ¶ 5]. Jones ultimately agreed to exit the car, and Sergeant Allen left the scene [Doc. 63-6, ¶ 10].

Later in the evening, Plaintiff called 911 to report that Jones had been breaking into his home and trespassing [*See* Doc. 63-1, 145:15–145:17; Doc. 63-5, ¶ 20; Doc. 63-6, ¶ 11; Doc. 63-7, ¶ 4]. Defendant FPD Officer Brandon Shirley was first to respond, followed by Sergeant Allen and Officer Bryant [*Id.*]. At some point, Plaintiff noticed Officer Bryant and remarked, "Hey, aren't you the one that killed my dog?" [Doc. 157:4–157:6]. Officer Bryant responded, "Yeah. I'm the one that killed your dog" [Doc. 157:9].

3

Plaintiff claimed that Jones did not reside at his house and was regularly trespassing by climbing through a window [Doc. 63-1, 140:13–140:22; Doc. 63-7, ¶ 6]. Jones, in turn, claimed she lived with Plaintiff [Doc. 63-7, ¶ 6]. Sergeant Allen asked Jones to provide proof of residence, which she went inside the house to procure [Doc. 63-6, ¶¶ 14–15]. While Jones was inside, Plaintiff said one of two things: (1) "I'm going to kill her" [Doc. 63-5, ¶ 23; Doc. 63-6, ¶ 15; Doc. 63-7, ¶ 11]; or (2) "She's going to mess around and get shot coming in through my window" [Doc. 63-1, 142:22–142:23]. Jones produced proof of residence, and Sergeant Allen arrested Plaintiff for threatening Jones [Doc. 63-6, ¶¶ 14, 16].

Sergeant Allen subsequently swore an Affidavit of Complaint charging Plaintiff with domestic assault [Doc. 63-9, pg. 2]. The Affidavit of Complaint added that, according to Jones, Plaintiff "had threatened to kill her multiple times on this date" [*Id.*]. When Jones failed to appear, the Court moved the case to the "retired" docket, permitting the State to reopen the case later. [Doc. 63-10].

## II. PROCEDURAL HISTORY

Plaintiff sued the City of Fayetteville, Tennessee, the FPD, Sergeant Allen, Officer Bryant, and Officer Shirley (collectively, "Defendants") for alleged civil rights violations [Docs. 1, 17]. Plaintiff contends that Officer Bryan violated his constitutional rights by killing his dog because it was unnecessary and racially motivated [Doc. 17, pg. 5]. Plaintiff further contends that his arrest violated his civil rights because it was not supported by probable cause [*Id.*]. As relief, Plaintiff seeks $5,000,000 and an injunction preventing FPD from harassing him in the future [Doc. 17,

pgs. 7, 10]. Defendants now move for summary judgment [Doc. 62]. Plaintiff filed an "Answer to the Defendant's Summary Judgment"[1] [Doc. 68].

## III.     LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The movant can discharge his burden by either affirmatively producing evidence establishing that there is no genuine dispute of material fact or pointing out the absence of support in the record for the nonmovant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant has discharged this burden, the nonmoving party can no longer rest on the allegations in the pleadings and must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc*., 285 F.3d 415, 424 (6th Cir. 2002). The Court's role is to determine whether, viewing the facts and drawing all inferences therefrom in the light most favorable to the nonmovant, a reasonable juror could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255-56 (1986). And when, as here, no response has been filed, the Court "must review carefully the portions of the record submitted by the moving party to determine whether a genuine dispute of material fact exists." *Federal Trade Comm'n v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 630 (6th Cir. 2014).

---

[1]      Plaintiff's "Answer" does not address any of Defendants' summary judgment arguments [*Compare* Doc. 63, *with* Doc. 68]. Instead, Plaintiff gives reasons for why the assigned Magistrate Judge should recuse herself from the case [Doc. 68, pgs. 1–3]. Because the Court is granting summary judgment, the Court does not address Plaintiff's request for recusal. The Court proceeds to consider Defendants' Motion for Summary Judgment as unopposed.

5

## IV.    ANALYSIS

### A.    Plaintiff's Fourth Amendment Claim against Officer Bryant for shooting Tyson, the dog.

Defendants argue that Officer Bryant is entitled to qualified immunity with respect to any constitutional claim arising from his shooting Tyson. Defendants argue that Plaintiff cannot establish an underlying constitutional violation because it was objectively reasonable for Officer Bryant to perceive Tyson as an "imminent threat" towards Animal Control Officer Laura Bryant [Doc. 64, pgs. 12–13]. Alternatively, Defendants argue that under the undisputed factual circumstances in this case Officer Bryant did not violate a clearly established constitutional right of Plaintiff [Doc. 64, pgs. 14–15].

Section 1983 of Title 42 provides a private cause of action against any person who, under color of state law, deprives an individual of their rights under the Constitution. Qualified immunity is an affirmative defense that shields government officials from suit under § 1983. *Barrett v. Steubenville City Schs.*, 388 F.3d 967, 970 (6th Cir. 2004). Once asserted, the burden is on the plaintiff to demonstrate that the defendant is not entitled to qualified immunity. *See v. City of Elyria*, 502 F.3d 484, 491 (6th Cir. 2007). To succeed, the plaintiff must prove: (1) that the defendant violated a constitutional right; *and* (2) that the violated right was "clearly established" at the time of the defendant's conduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

The Fourth Amendment protects "people" and their "effects" from unreasonable seizures. U.S. Const. amend. IV. The Sixth Circuit has held that "an individual's dog … counts as an 'effect.'" *White v. City of Detroit*, 38 F.4th 495, 498 (6th Cir. 2022). And the use of deadly force against a person's dog constitutes a "seizure" of that person's "effect." *Id., see also Bullock v. City of Detroit*, 814 F. App'x 945, 952 (6th Cir. 2020). The focus of the reasonableness inquiry requires a balancing of the "nature and quality of the Fourth Amendment intrusion against the

6

importance of the governmental interests alleged to justify the intrusion." *White*, 38 F.4th at 498 (citations and internal quotation marks omitted). Ultimately, the question is "Was the seizure 'more intrusive than necessary?'" *Id*. (quoting *Florida v. Royer*, 460 U.S. 491, 504 (1983)).

"An officer may reasonably use lethal force against a pet that poses an 'imminent threat.'" *Id*. (quoting *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 567 (6th Cir. 2016)). Threat of danger is "imminent" when there is "an immediate, real threat to one's safety that justifies the use of force in self-defense, or the danger resulting from an immediate threatened injury sufficient to cause a reasonable and prudent person to defend himself or herself." *Brown*, 844 F.3d at 567 (alterations and internal quotation marks omitted).

A reasonable jury could reach no other conclusion than that it was objectively reasonable for Officer Bryant to perceive Tyson an imminent threat towards Officer Laura Bryant. At the time of the shooting, Officer Bryant was confronted with a loose and roaming aggressive dog, which according to the record in this case weighed 60 pounds [Doc. 63-4, 14:4, 14:7, 14:10]. Tyson had already attacked and bloodied another dog, "aggressively" ran towards a group of children, repeatedly evaded capture, and "growled" at Jones when she attempted to approach it [Doc. 63-5, ¶¶ 4, 8–9, 12, 14, 16, 17]. Officer Bryant had also been warned by concerned neighbors that Tyson was aggressive and by Jones that Tyson would bite [Doc. 63-5, ¶ 6]. And at the time of the shooting, Tyson was running towards an unsuspecting Laura Bryant as she exited her truck [Doc. 63-3, 9:11–9:12, 9:14–9:15, 9:18–9:20; Doc. 63-5, ¶ 19]. A reasonable jury could only conclude that it was objectively reasonable for Officer Bryant to perceive Tyson an imminent threat to Laura Bryant's safety. *Cf. Altman v. City of High Point*, 330 F.3d 194, 206 (4th Cir. 2003) (holding that it was objectively reasonable for an officer to use deadly force to prevent a Rottweiler from escaping, noting that the dog that was on the loose and had been roaming the neighborhood,

7

the dog attacked one person already, and the officer understood from conversations with neighbors that the dog was aggressive and dangerous). Given Tyson's aggressive behavior in this case, as unfortunate as it is to lose a pet dog, Officer Bryant's conduct here in shooting the dog did not violate Plaintiff's Fourth Amendment rights, and Officer Bryant is entitled to qualified immunity. Thus, Defendants' Motion is **GRANTED** as to Plaintiff's claim that that Officer Bryant violated the Fourth Amendment when he shot and killed Plaintiff's dog.

### B. Plaintiff's wrongful arrest claim against Sergeant Allen and Officer Shirley for their arrest

Defendants argue that Plaintiff cannot succeed on his claim against Sergeant Allen and Officer Shirley for their arrest of Plaintiff because they had probable cause to believe that Plaintiff threatened to breach the peace [Doc. 64, pgs. 19–21]. To be sure, an arrest without probable cause violates the Fourth Amendment. *Rieves v. Town of Smyrna*, 959 F.3d 678, 696 (6th Cir. 2020) (citations omitted). A police officer has probable cause when, at the time of the arrest, "the facts and circumstances within [the arresting officer's] knowledge and of which [the arresting officer] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

Before proceeding the Court acknowledges that Defendants do not argue that Sergeant Allen and Officer Shirley had probable cause to arrest Plaintiff for domestic assault—the crime for which he was later prosecuted [Doc. 63-9, pg. 2]. The tacit concession is well-taken. Tennessee criminal assault requires, among other things, an intentional act that either causes bodily injury or places the victim in reasonable fear if imminent bodily injury. Tenn. Code Ann. § 39-13-101(a)(1)–(a)(2). Assault becomes domestic assault when committed against, among others, a cohabitating adult. Tenn. Code Ann. § 39-13-111(a)(3), (b). Assault necessarily requires that the victim actually receive physical contact or be in a position to perceive an act that creates a

8

reasonable fear of imminent bodily injury. *See State v. Dotson*, 254 S.W.3d 378, 396 (Tenn. 2008). The record evidence indicates that Jones was not physically present at the time Plaintiff made the statement that formed the basis for his arrest [Doc. 63-6, ¶¶ 15–16; Doc. 63-7, ¶ 11; Doc. 63-8, 48:1–48:7, 48:12–48:19].  Thus, the officers did not have an objectively reasonable belief that Plaintiff committed domestic assault.

Nevertheless, the probable cause requirement for a warrantless arrest can be satisfied if probable cause existed for *any* crime, even if different from the one cited by the arresting officer. *Howse v. Hodous*, 953 F.3d 402, 409 (6th Cir. 2020) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153–55 (2004)).  Defendants point to Tenn. Code Ann. § 40-7-103(a)(1), which authorizes warrantless arrests "[f]or . . . a breach of the peace threatened in the officer's presence[.]"  "The term 'breach of the peace' is a generic term that includes all violations or potential violations of the public peace and order." *Davenport v. Chrysler Credit Corp.*, 818 S.W.2d 23, 28 (Tenn. Ct. App. 1991)(citations omitted).  This includes a threat to assault or wound another person committed in the officer's presence.  Tenn. Code Ann. § 38-3-108.  "A crime is committed in the presence of an officer [w]here an officer is apprised by any of his senses that a crime is being committed[.]"  *Nelson v. State*, 413 S.W.2d 358, 362 (Tenn. 1967) (internal quotation marks omitted).  And an officer may arrest a person to precent a violation of law, even when the violation has not yet occurred.  *Hughes v. State*, 238 S.W. 588, 596 (Tenn. 1921).

In this case, Plaintiff made a direct threat of "killing" his former girlfriend who was in the house at the time.  Although Jones was not present at the time of the threat, it was objectively reasonable for Sergeant Allen and Officer Shirley to believe they had probable cause to arrest Plaintiff for threatened breach of the peace.  The crime which they sought to prevent was domestic assault, which requires an intent to commit an assault coupled with an ability to do so.  *Casey v.*

*State*, 491 S.W.2d 90, 93 (1972). The facts before the officers were sufficient to create a reasonable belief that Plaintiff intended to commit an assault. Sergeant Allen was familiar with Plaintiff and Jones from a previous incident in which Jones showed Sergeant Allen a video of "Mr. Eady grabbing her and attempting to pull her out of bed." [Doc. 63-6, ¶ 6]. The day of the arrest, Sergeant Allen had already intervened once in an argument over Jones's presence in Plaintiff's car [Doc. 63-6, ¶ 8]. In response to the second 911 call, Plaintiff informed Sergeant Allen and Officer Shirley that Jones was breaking into his house through a window [Doc. 63-6, ¶ 13]. Plaintiff also indicated that Jones had done so on more than one occasion [Doc. 62-1, 143:17–143:22]. Jones proved that she was a resident of the house [Doc. 63-6, ¶ 14]. And, in the officers' presence, Plaintiff stated, "She's going to mess around and get shot coming in through my window" [Doc. 62-1, 142:22–142:23]. Plaintiff's own statement suggested that he possessed a gun and, therefore, the ability to go through with the threat. Thus, it was objectively reasonable for the officers to construe Plaintiff's statement as a threat of harm directed towards Jones. *See* Tenn. Code Ann. §§ 38-3-108, 40-7-103(a)(1). Therefore, Sergeant Allen and Officer Shirley did not violate Plaintiff's Fourth Amendment rights when they "seized" Plaintiff, and both officers are entitled to qualified immunity. Thus, Defendants' Motion is **GRANTED** as Plaintiff's Fourth Amendment claim against Sergeant Allen and Officer Shirley.

### C.    Fourteenth Amendment: Equal Protection

Defendants argue that Plaintiff failed to plausibly allege or submit evidence with which to establish an equal protection violation based on Officer Bryant's conduct [Doc. 64, pg. 15]. Defendants argue that the Amended Complaint fails to adequately plead an Equal Protection claim because it offers only conclusory statements of discriminatory animus [Doc. 64, pg. 16].

10

Defendants further argue that that Plaintiff failed to substantiate his race-based allegations with evidence [Doc. 64, pgs. 16–17].

The Equal Protection Clause of the Fourteenth Amendment guarantees "the equal protection of the laws." U.S. Const. amend. XIV, § 1. This includes a right of protection against searches and seizures that is independent of the Fourth Amendment. *United States v. Avery*, 137 F.3d 343, 353 (6th Cir. 1997). In particular, the Equal Protection Clause "prohibit[s] racial targeting in law enforcement investigations, regardless of whether an encounter was lawful under the Fourth Amendment." *Farm Labor Org. Comm. v. Ohio State Hwy. Patrol*, 308 F.3d 523, 542 (6th Cir. 2002). To succeed on an Equal Protection claim, a plaintiff must show that "a state actor intentionally discriminated against the plaintiff because of membership in a protected class." *Henry v. Metro. Sewer Dist.*, 922 F.2d 332, 341 (6th Cir. 1990) (internal quotation marks omitted). This requires that the plaintiff either negate every conceivable basis for the state actor's conduct or show "that the challenged conduct was motivated by animus or ill-will." *Trihealth, Inc. v. Board of Comm'rs*, 430 F.3d 783, 787 (6th Cir. 2005). Bare allegations of discriminatory intent are insufficient at summary judgment. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584–85 (6th Cir. 1992).

Plaintiff was repeatedly asked during his deposition what evidence he had of Officer Bryant's racial animus against him. Plaintiff indicated that the evidence was Officer Bryant's conduct on three occasions. First, Plaintiff testified that on December 20, 2021, Officer Bryant "ignored" Plaintiff when responding to Plaintiff's 911 call that someone was photographing Plaintiff without Plaintiff's consent [Doc. 62-1, 91:19–92:6]. Second, Plaintiff testified that Officer Bryant shot his dog Tyson because of a racial animus [Doc. 62-1, 93:1–93:13]. Third, Plaintiff testified that Officer Bryant told him at the time of his arrest, "I'm the one that shot your

11

dog," in a way that lacked remorse [Doc. 62-1, 93:17–93:25]. However, Plaintiff testified that he asked Officer Bryant first whether he was the one who shot his dog [Doc. 62-1, 157:4–157:6].

None of these instances suggest that Officer Bryant acted out of a discriminatory animus based on Plaintiff's race. As discussed above, Officer Bryant had an objectively reasonable belief that Tyson posed an imminent threat of harm. As also discussed above, Plaintiff's arrest was supported by probable cause. Plaintiff's contentions of racial animus amount to nothing more than bare assumptions without evidentiary support. Without more, Plaintiff cannot succeed on an Equal Protection claim against Officer Bryant. Thus, Defendants' Motion is **GRANTED** as to Plaintiff's Equal Protection claim against Officer Bryant.

### D.    Municipal Liability

Defendants last argue that Plaintiff failed to plausibly allege or prove municipal liability against the City of Fayetteville [Doc. 64, pg. 21]. Defendants argue that the City of Fayetteville cannot be liable because Plaintiff failed to establish an underlying constitutional violation [Doc. 64, pg. 22]. Defendants argue that the First Amended Complaint also fails to explain how the City of Fayetteville's policy, custom, or practice caused any constitutional injury [*Id.*].

Liability under § 1983 extends to local government entities when the predicate unconstitutional act "occurred because of a municipal policy or custom." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). However, "there can be no municipal liability under *Monell* when there is no constitutional violation." *Przybysz v. City of Toledo*, 746 F. App'x 480, 484 (6th Cir. 2018).

As discussed above, Plaintiff failed to establish a violation of his Fourth Amendment and Fourteenth Amendment Equal Protection rights. Without an underlying constitutional violation,

Plaintiff likewise cannot proceed under *Monell*. *Id.* Thus, Defendants' Motion is **GRANTED** as Plaintiff's claim for municipal liability against the City of Fayetteville.[2]

## V.      CONCLUSION

For the reasons discussed above, Defendants' Motion for Summary Judgment [Doc. 62] is **GRANTED**. Plaintiff's Amended Complaint is **DISMISSED** as to all claims. Plaintiffs' pending Motion to Cease and Desist [Doc. 62] is **DENIED** as moot.

**SO ORDERED:**

s/ Clifton L. Corker
United States District Judge

---

[2]      Summary judgment is also granted with respect to any claim against the FPD. *See Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) ("[A] Police Department is not an entity which may be sued[.]); *Mathes v. Metropolitan Gov't of Nashville & Davidson Cnty.*, No. 3:10-cv-0496, 2010 WL 3341889, at *2 (M.D. Tenn. Aug. 25, 2010) ("[F]ederal district courts in Tennessee have frequently and uniformly held that police departments . . . are not proper parties to a § 1983 suit.").

13